IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| SUSAN WATERS, SALLY WATERS, NICKOLAS KRAMER, JASON CADEK, CRYSTAL VON KAMPEN, CARLA MORRIS-VON KAMPEN, GREGORY TUBACH, WILLIAM ROBY, JESSICA KALLSTROM-SCHRECKENGOST, KATHLEEN KALLSTROM-SCHRECKENGOST, MARJORIE PLUMB, TRACY WEITZ, RANDALL CLARK, THOMAS MADDOX,<br><br>Plaintiffs,<br><br>v.<br><br>PETE RICKETTS, in his official capacity as Governor of Nebraska; DOUG PETERSON, in his official capacity as Attorney General of Nebraska; LEONARD J. SLOUP, in his official capacity as Acting Tax Commissioner of the Nebraska Department of Revenue; JOSEPH ACIERNO, in his official capacity as Acting CEO of the Nebraska Department of Health and Human Services; and DAN NOLTE, in his official capacity as the Lancaster County Clerk;<br><br>Defendants. | **8:14CV356**<br><br>**MEMORANDUM AND ORDER** |

This matter is before the court on the plaintiffs' motion for a preliminary injunction, Filing No. 10. This is an action for violation of civil rights brought pursuant to 42 U.S.C. § 1983. The plaintiffs seek declaratory and injunctive relief for violation of rights protected by the Fourteenth Amendment by virtue of Nebraska's exclusion of same-sex couples from marrying and its prohibition against recognizing the marriages of same-sex couples validly entered into in other jurisdictions under Neb. Const. art. I, § 29 (hereinafter, "Section 29" or "the Amendment").

I.      BACKGROUND

The court heard oral argument on the motion on February 19, 2015.  The parties offered affidavits in support of their respective positions.  *See* Filing No. 10, Index of Evid., Exs. A to N; Filing No. 44, Index of Evid., Exs. 1-3. There are no substantive objections to the affidavits for purposes of this motion.[1]   In response to questioning by the court, the parties requested and were granted leave to submit additional materials. The court has received and reviewed those materials.  *See* Filing No. 51 and Filing No. 52.

The plaintiffs challenge the constitutionality of Section 29 of the Constitution of the State of Nebraska.  The challenged amendment provides "[o]nly marriage between a man and a woman shall be valid or recognized in Nebraska.  The uniting of two persons of the same sex in a civil union, domestic partnership, or other similar same-sex relationship shall not be valid or recognized in Nebraska."  Neb. Const. art. I, § 29. The plaintiffs are same-sex couples who seek to marry in Nebraska or to have their marriages from other states recognized in Nebraska.  They assert claims for deprivation of their fundamental right to marry and allege discrimination on the basis of sexual orientation and gender in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution.   The defendants (hereinafter referred to, collectively, as "the State") are Nebraska officials charged with enforcing the State's marriage laws.

A.      Facts

---

[1] The State objects to the post-hearing declaration of counsel Angela Dunne on the basis of speculation and lack of personal knowledge.  *See* Filing No. 52.  The court finds the motion should be overruled and the evidence will be considered to the extent it is relevant.

The evidence establishes that plaintiffs Sally and Susan Waters, ages 58 and 53, have been in a committed relationship for over fifteen years. They were married in a religious ceremony in Nebraska in 1998, and were married in 2008 in California.  They have two adopted children, ages 13 and 10.  The children were adopted in California. They have also been legal guardians of a teenager, now 18, since 2011.

Sally Waters was diagnosed with Stage III breast cancer in 2013.  She was diagnosed with Stage IV metastatic breast cancer in April 2014.  The cancer has spread to her spine and it was disclosed at the hearing that her doctors have recently discovered another tumor.  Susan Waters carries health insurance for the entire family through her employer.  The portion of the employer-paid premium for Sally is taxed as income to Susan.  Neither of them has survivor benefits.

 Susan and Sally Waters have shown that it causes them great distress to know their marriage is not recognized under Nebraska law.  They are particularly distressed by the fact that when Sally Waters passes away, the status on her death certificate will state "single."  The fact that their marriage is not recognized is stigmatizing and demeaning to the Waterses and their children.  Further they have shown that when Sally Waters passes away, Susan will not collect benefits as a widow since their marriage is not recognized in Nebraska.  Neither will she be entitled to collect Social Security retirement benefits as Sally Waters's spouse.  Also, Susan Waters will be unable to roll Sally Waters's 401K benefits into her own IRA, rather, she will be required to pay taxes on the benefits.  In addition, the Waterses have shown that they are required to file Nebraska taxes as "single," as opposed to "married," costing them higher taxes and tax-preparation fees.

They seek the ability to make medical decisions on each other's behalf. They have shown that they will suffer immediate and irreparable financial harm when Sally Waters passes away because Susan Waters will be required to pay 18% inheritance tax on Sally Waters's share of property they jointly own rather than the spousal rate of 1%. Further, she will not be entitled to a widow's homestead exemption. They have also shown that the State's nonrecognition of their marriage is hurtful and demeaning to them and to their children.

Plaintiffs Nickolas Kramer and Jason Cadek, ages 42 and 37, have been in a committed relationship for ten years. They were married in 2013 in Iowa. They are the parents of a three-year-old girl that Nickolas Kramer adopted in a single parent adoption in Nebraska. They have shown that the lack of a legal parent-child relationship between the child and Jason Cadek denies their daughter important protections and resources and causes them profound stress and insecurity. They have to file taxes in Nebraska as "single," causing expense. Jason Cadek carries health insurance on the entire family. However, the employer-paid portion of the premium to cover Nickolas is imputed as taxable income. Neither of them has survivor benefits.

Plaintiffs Carla Morris-Von Kampen and Crystal Von Kampen, ages 40 and 35, have been in a committed relationship for five years. They were married in 2013 in Iowa. Crystal Von Kampen retired from the United States Navy after serving eight years. She suffers from PTSD. She has shown she was not allowed to get a Veterans Administration ("VA") veteran and spouse loan because her marriage to Carla Morris-Von Kampen is not recognized in Nebraska, costing them $11,000.00 more on their loan. Crystal Von Kampen has also shown that Carla Morris-Von Kampen's daughter

4

from a previous marriage is unable to take advantage of a tuition waiver granted to stepchildren of disabled veterans because the marriage is not recognized in Nebraska, resulting in increased costs of $5600.00.  They also have to file Nebraska taxes as "single," causing them expense.  Crystal carries health insurance for the entire family through Military TriCare benefits.  Although Crystal Von Kampen has a survivor benefit through the VA, she does not know whether this will follow federal or state rules.

Plaintiffs Jessica Kallstrom-Schreckengost and Kathleen Kallstrom-Schreckengost, ages 33 and 29, have been in a committed relationship for ten years and were married in 2010 in Massachusetts.  They have a nine-month-old son, who was born in New York. They want more children but they worry about the fact that only one partner would be the child's legal parent.  They also file taxes as "single," causing them expense.  Neither of them has survivor benefits.  They purchased health insurance for their family through the Healthcare Marketplace.  They have shown that denying the existence of their marriage is hurtful and demeaning to them and to their child.

Plaintiffs William Roby and Gregory Tubach, ages 49 and 57, have been in a committed relationship for twenty-eight years.  They live in Lincoln, Nebraska, and want to get married in Nebraska since it is their home and their friends and extended family live in Nebraska.  They have taken steps to replicate the protections of marriage such as preparing wills, powers of attorney, and healthcare directives, which has caused them significant expense, but find that the execution of such documents provides only a fraction of the protections that marriage would provide.  In addition, they desire to obtain the security and dignity that comes with being married.

Marjorie Plumb and Tracy Weitz, ages 55 and 49, have been in a committed relationship for over ten years.  They were married in 2008 in California.  They have shown they will not be recognized as spouses by medical providers regarding decision-making and access to medical records.  They are denied the peace of mind of knowing that when one of them dies, the other will be able to retain all of their shared property, including their jointly owned home, as opposed to having to pay 18% Nebraska inheritance tax.  They have hired attorneys to draw up wills and powers of attorney at an expense of about $1,000.00, but are aware that the documents provide only a fraction of the protections that come with marriage.  They have to file Nebraska taxes as "single."  They have also shown that the nonrecognition of their marriage is demeaning and hurtful and tha they feel like second-class citizens.  They have purchased health insurance through the Healthcare Marketplace.  Neither of them has survivor benefits.

Plaintiffs Randall Clark and Thomas Maddox are 57 and 61 years old.  They have been in a committed relationship for over thirty years.  They were married in 2008 in California and they presently live there.  They grew up and were educated in Nebraska.  They own commercial property in Nebraska and are required to file Nebraska taxes as "single."  Having to file as "single" in Nebraska adds to the burden of their tax preparation.  They would like their marriage recognized in Nebraska.  It upsets them when they visit Nebraska and effectively are regarded as unmarried for the duration of the visit.  They are concerned that they would not be regarded as spouses if they were to become ill or die while visiting.

Plaintiffs Susan and Sally Waters; Nickolas Kramer and Jason Cadek; Crystal Von Kampen and Carla Morris-Von Kampen; Jessica and Kathleen Kallstrom-

Schreckengost; Marjorie Plumb and Tracy Weitz; and Randall Clark and Tom Maddox were all were validly married under the laws of other states and their marriages would be recognized in Nebraska but for the fact that they are married to a person of the same gender.  Plaintiffs Gregory Tubach and William Roby are eligible to marry but for the fact that they wish to marry someone of the same sex.  They are over the age of 18, fully competent, not married to anyone else, not within a prohibited degree of consanguinity of each other, and are willing and able to assume all of the obligations of marriage.

The State submits evidence, legislative history submitted in *Citizens for Equal Prot. v. Bruning*, 455 F.3d 859 (8th Cir. 2006), to show that Nebraskans wanted to ensure that public policy regarding marriage in Nebraska was determined by Nebraskans rather than by another state under the Full Faith and Credit Clause.  *See* Filing No. 44, Index of Evid., Ex. 3, Affidavit of David T. Bydalek.  It contends the purpose was not to impose stigma or disadvantage on same-sex couples.

The State also submits the Affidavit of Catherine Pakaluk, Ph.D., in which she states she reviewed the findings of several peer-reviewed studies and endorses their conclusions.[2]  Id., Ex. 1,  Affidavit of Catherine Pakaluk, Ph.D. ("Pakaluk Aff.") at 2-3.

---

[2] The referenced studies essentially conclude that outcomes between children raised by same-sex couples and children raised by opposite-sex couples differ in several respects.  *See* Loren Marks, "*Same-Sex Parenting and Children's Outcomes: A Closer Examination of the American Psychological Association's Brief on Lesbian and Gay Parenting*," 41 Social Science Research 735 (2012); Mark Regnerus*, "How Different Are the Adult Children of Parents Who Have Same-Sex Relationships? Findings from the New Family Structures Study*," 41 Social Science Research 752 (July 2012); Mark Regnerus, "*Parental Same-Sex Relationships, Family Instability, and Subsequent Life Outcomes for Adult Children: Answering Critics of the New Family Structures study with Additional Analysis*," 41 Social Science Research 1367 (November 2012); Walter R. Schumm, *"Methodological Decisions and the Evaluation of Possible Effects of Different Family Structures on Children: The New Family Structures Survey (NFSS),"* 41 Social Science Research 1357 (November 2012); Douglas W. Allen, Joseph Price,

Dr. Pakaluk also professes the opinion that "there is not a consensus within the scientific community that children raised by same-sex couples fare no differently than children raised by opposite-sex couples." *Id.* at 3. Further, the State submits the Affidavit of Joseph M. Acierno to show that the marriage worksheet, which is required for couples applying for a marriage license under Nebraska law, is devoid of any requirement that an applicant disclose their sexual orientation. *Id.*, Ex. 2.

B.    The Parties' Arguments

The plaintiffs move for a preliminary injunction, arguing that they are experiencing real, immediate, and irreparable harm from the State's refusal to let them marry or to recognize their marriages from other states. They contend it is likely they will succeed on the merits of their claims in light of recent Supreme Court and Circuit Court precedent on the issue. *See United States v. Windsor*, 133 S. Ct. 2675 (2013) (invalidating federal Defense of Marriage Act ("DOMA")); *Baskin v. Bogan*, 766 F.3d 648 (7th Cir. 2014) (invalidating Indiana and Wisconsin same-sex marriage bans); *Bostic v. Schaefer*, 760 F.3d 352 (4th Cir.), *cert. denied*, 135 S. Ct. 308 (2014) (invalidating Virginia same-sex marriage ban); *Kitchen v. Herbert*, 755 F.3d 1193 (10th

---

and Catherine Pakaluk, *"Nontraditional Families and Childhood Progress through School: A Comment on Rosenfeld,"* 50 Demography 955 (June 2013); Walter R. Schumm, *"Comparative Relationship Stability of Lesbian Mother and Heterosexual Mother Families: A Review of Evidence,"* 46 Marriage and Family Review 499 (2010); Douglas W. Allen, *"High School Graduation Rates Among Children of Same-Sex Households,"* 11 Review of Economics of the Household 635 (December 2013); *see* Filing No. 44-1, Index of Evid., attachments.

Several of those studies and testimony by the authors of those studies were found largely "unbelievable and not worthy of consideration" and characterized as expressing a "fringe viewpoint that is rejected by the vast majority of [the studies' authors'] colleagues across a variety of social science fields" by the District Court in the case later reversed by the Sixth Circuit Court of Appeals and now pending before the Supreme Court. *DeBoer v. Snyder*, 973 F. Supp. 2d 757, 768 (E.D. Mich.), *rev'd*, 772 F.3d 388 (6th Cir. 2014), *cert. granted sub nom. Obergefell v. Hodges*, 135 S. Ct. 1039 (2015); *see also DeBoer v. Snyder*, 973 F. Supp. 2d at 767 (Daughtrey, J., dissenting) (noting the studies were given little credence by the district court because of inherent flaws in the methods used or the intent of the authors).

Cir.) (invalidating Utah same-sex marriage ban), *cert. denied,* 135 S. Ct. 265 (2014); *Bishop v. Smith*, 760 F.3d 1070 (10th Cir.), *cert. denied*, 135 S. Ct. 271 (2014) (invalidating Oklahoma same-sex marriage ban); *Latta v. Otter*, 771 F.3d 456 (9th Cir.), *stay denied*, 135 S. Ct. 345 (2014) (invalidating Nevada and Idaho same-sex marriage bans); *but see DeBoer v. Snyder*, 772 F.3d 388 (6th Cir. 2014) (upholding Michigan statute and constitutional amendment prohibiting same sex marriage), *cert. granted sub nom. Obergell v. Hodges*, No. 14-556, 2015 WL 213646 (Jan. 16, 2015).  The plaintiffs argue the Amendment cannot withstand constitutional muster under either strict scrutiny for deprivation of a fundamental liberty interest protected by the Due Process Clause, or under heightened scrutiny under the Equal Protection Clause for discrimination on the basis of their sexual orientation or gender.  Further, they argue the harm they will suffer outweighs any harm to the State and they contend that injunctive relief is in the public interest.

In opposition to the motion, the State argues that the plaintiffs are not likely to succeed on the merits of their claims.  It first argues that the plaintiffs' claims are foreclosed by Supreme Court and Eighth Circuit precedent.[3]  It also argues that there is no fundamental right to same-sex marriage and contends that Nebraska's marriage laws are subject to, and easily satisfy, rational basis review.  The State argues it has a legitimate interest in "steer[ing] naturally procreative relationships into enduring unions

---

[3] The State cites *Windsor*, 133 S. Ct. at 2691 (noting the traditional authority of the states to regulate domestic relations matters), *Baker v. Nelson*, 409 U.S. 810 (1972), and *Citizens for Equal Prot. v. Bruning*, 455 F.3d at 867 for this proposition.

and link[ing] children to both of their biological parents."[4]  *See* Filing No. 43, Defendants' Brief at 30; *see* Filing No. 44, Index of Evid., Ex. 1, Affidavit of Catherin Pakaluk at 3 (reviewing attached peer-reviewed studies and stating "there is <u>not</u> a consensus with the scientific community that children raised by same-sex couples fare no differently than children raised by opposite-sex couples") (emphasis in original).  In addition, the State argues that the challenged marriage laws are not subject to heightened scrutiny because "man-woman couples and same-sex couples are not similarly situated with regard to the State's interest in connecting children to both biological parents."  *Id.* at 33.  Also, it argues that the Amendment does not impermissibly discriminate on the basis of gender because the prohibition applies with equal force to same-sex couples of both genders.  *Id.* at 24.

The State also argues that the balance of harms and the public interest favor a denial of injunctive relief.  It contends it will be harmed by the inability to enforce its duly-enacted laws and argues the public has an overriding interest in having stable marriage laws.  It also contends that any grant of injunctive relief has the potential to create confusion in local government, and will risk throwing established administrative processes into turmoil.

At the hearing, the State orally moved for a stay of any injunction that might issue to allow it to file an appeal.

---

[4] In this connection, it argues "[o]nly sexual relationships between a man and a woman advance the State's interest because only those relationships naturally produce children and are able to provide those children with both of their biological parents."  Filing No. 43, Defendant's Brief at 32.

II.    LAW

    A.    Injunctive Relief

The issuance of a preliminary injunction depends upon a "flexible" consideration of the probability that the moving party will succeed on the merits of the claim, the threat of irreparable harm to the moving party, balancing that harm with any injury an injunction would inflict on other interested parties; and the effect on the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). Evaluating the likelihood of success on the merits calls for a predictive judgment about how a court is likely to rule. *See, e.g., Minnesota Citizens Concerned for Life v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012). Where a preliminary injunction is sought to enjoin the implementation of a duly enacted state statute, district courts must make a threshold finding that a party is likely to prevail on the merits. *Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds*, 530 F.3d 724, 732-33 (8th Cir. 2008) (*en banc*). In such cases, it is only after finding that a party is likely to prevail on the merits that a district court should weigh the other *Dataphase* factors. *Id.* at 732.

"'The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.'" *Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir. 1999) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959)). A plaintiff must demonstrate "that remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The question of irreparable injury is sometimes tied to the merits of a constitutional claim. *See, e.g. Kroupa v. Neilsen*, 731 F.3d 813, 820 (8th Cir. 2013) (noting in a deprivation of procedural due process case

that damage to one's reputation is a harm that cannot be remedied by a later award of money damages, the threat of reputational harm may form the basis for preliminary injunctive relief). If a party can establish a sufficient likelihood of success on the merits of a constitutional claim, "the party will also have established irreparable harm as the result of the deprivation." *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (holding that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.")[5]

A showing of irreparable harm does not automatically mandate a ruling in the plaintiff's favor; the court must proceed to balance the harm to the defendant in granting the injunction. *Hill v. Xyquad, Inc.*, 939 F.2d 627, 630-31 (8th Cir. 1991). The state has an interest in ensuring its legitimate laws are followed. *New Motor Vehicle Bd. Of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (staying injunction). However, the protection of constitutionally protected rights necessarily serves the public interest. *Phelps–Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008) ("[I]t is always in the public interest to protect constitutional rights."), *overruled on other grounds by Phelps–Roper v. City of Manchester, Mo.*, 697 F.3d 678 (8th Cir. 2012).

---

[5] In *Windsor*, the Supreme Court identified several harms flowing from DOMA's same-sex marriage ban: "humiliation of tens of thousands of children now being raised by same-sex couples," "financial harm to children by raising the cost of health care for families by taxing health benefits provided by employers to their workers' same sex spouses," and "denying or reducing benefits allowed to families upon the loss of a spouse and parent, benefits that are an integral part of family security." *Windsor*, 133 S. Ct. at 2694-96; *see also Latta*, 771 F.3d at 476 (finding "Idaho and Nevada's marriage laws, by preventing same-sex couples from marrying and refusing to recognize same-sex marriages celebrated elsewhere, impose profound legal, financial, social and psychic harms on numerous citizens of those states.").

12

B.     Constitutional Claims

1.     Constitutional Standards

"State laws defining and regulating marriage, of course, must respect the constitutional rights of persons." *Windsor*, 133 S. Ct. at 2691.  All fundamental rights comprised within the term liberty are protected by the federal constitution from invasion by the States. *Planned Parenthood v. Casey*, 505 U.S. 833, 846-47 (1992). The doctrine of substantive due process extends protections to fundamental rights in addition to the specific freedoms protected by the bill of rights.  *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997); *see also Casey*, 505 U.S. at 848.  A law that burdens a fundamental right is subject to strict scrutiny.  *Casey*, 505 U.S. at 848.  Strict scrutiny requires the state law serve a compelling state interest and the means used must be narrowly tailored to achieve that end.  *Griswold v. Connecticut*, 381 U.S. 479, 486 (1965).

The Supreme Court has held that the right to marry is a fundamental liberty.[6] *Griswold,* 381 U.S. at 479; *Maynard v. Hill*, 125 U.S. 190, 205 (1888); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923); *Loving v. Virginia*, 388 U.S. 1, 12 (1967).  It has held that the fundamental right to marry cannot be restricted on the criteria of race, incarceration, or failing to pay child support.  *Loving*, 388 U.S. 1 (race), *Turner v. Safley*, 482 U.S. 78, 95-97 (1987) (incarceration); *Zablocki v. Redhail*, 434 U.S. 374, 382 (1978) (failing to pay child support).  The right to marry is separate from the right to procreate.  *See Glucksberg*, 521 U.S. at 720; *M.L.B. v. S.L.J.*, 519 U.S. 102, 116

---

[6] Counsel for the State conceded at oral argument that there is a fundamental right to marriage only if defined as "between a man and a woman."

(1996); *Griswold*, 381 U.S. at 485-86 (rejecting the view that marriage is only about procreation); *Turner*, 482 U.S. at 95-96 (describing many other purposes of marriage).

In the context of challenges to similar same-sex marriage bans, the Fourth and Tenth Circuits have held that same-sex marriage is subject to the same constitutional protections as the traditional right to marry.[7] *See Kitchen*, 755 F.3d at 1218; *Bostic,* 760 F.3d at 377. Those courts applied strict scrutiny to determine whether the marriage laws at issue violated rights to substantive due process and equal protection. *See Kitchen*, 755 F.3d at 1209-11; *Bostic*, 760 F.3d at 376. In the course of their analysis, the courts rejected the states' reliance on various justifications for the same-sex marriage bans, including a purported interest in fostering biological reproduction, encouraging optimal childrearing, maintaining gendered parenting styles, maintaining control of the definition of marriage, adhering to the tradition of opposite-sex marriage, protecting the institution of marriage, and encouraging responsible procreation. *See Kitchen*, 755 F.3d at 1222; *Bostic*, 760 F.3d at 378.

---

[7] Numerous district courts have also held that same-sex marriage is a fundamental right. *See Rosenbrahn v. Daugaard,* No. 14CV4081, 2015 WL 144567 (D.S.D. Jan. 12, 2015), *appeal docketed*, No. 15-1186 (8th Cir. Jan. 28, 2015); *Campaign for S. Equal. v. Bryant,* No. 3:14CV818, 2014 WL 6680570 at *11 (S.D. Miss. Nov. 25, 2014) (concluding that there is no new fundamental right at issue, rather the question "is whether gay and lesbian people, like any other group of people, have the freedom of choice to marry"); *Jernigan v. Crane,* No. 4:13CV410 KGB, 2014 WL 6685391 at *16–*17 (E.D. Ark. Nov. 25, 2014), *appeal docketed*, No. 15-1022 (8th Cir. Jan. 7, 2015); *Lawson v. Kelly,* No. 14CV622, 2014 WL 5810215 at *6–*8 (W.D. Mo. Nov. 7, 2014), *appeal docketed*, No. 14-3779 (8th Cir. Dec. 12, 2014); *Brenner v. Scott,* 999 F. Supp. 2d 1278, 1288–89 (N.D. Fla. 2014); *Whitewood v. Wolf,* 992 F. Supp. 2d 410, 423–24 (M.D. Pa. 2014); *De Leon v. Perry,* 975 F. Supp. 2d 632, 658–59 (W.D. Tex. 2014). *But see Robicheaux v. Caldwell,* 2 F. Supp. 3d 910, 922 & n. 13 (E.D. La. 2014); *Love v. Beshear*, 989 F. Supp. 2d 536, 544 (W.D. Ky. 2014).

14

Under the Due Process Clause, a state's legislative enactments are entitled to deference unless they infringe fundamental rights or proceed along suspect lines. *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993) (stating that "equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices," and a "classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."). The modern tiers of scrutiny—rational basis, intermediate scrutiny, and strict scrutiny—are a framework to help courts determine when classifications have the requisite fair and substantial relation to the object of the legislation. *See Reed v. Reed*, 404 U.S. 71, 76 (1971) (holding unconstitutional a statutory preference for males over females in administering a decedent's estate). Underlying equal protection jurisprudence is the central notion that a classification must be reasonable, not arbitrary, and must rest on some ground of difference having a fair and substantial connection to the object of the legislation so that all persons similarly circumstanced are treated alike. *Id.* So-called rational basis review applies to classifications based on distinguishing characteristics that the state has the authority to implement where the classification is not viewed as inherently suspect. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440 (1985).

At the other end of the spectrum are classifications that are subject to strict scrutiny. *Id.* (regarding a classification by race, alienage, or national origin). Those classifications are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and

antipathy.  *Id.* (noting it would be utterly irrational to limit the franchise on the basis of height, weight or skin color).  Like laws that burden fundamental rights, enactments that involve those classifications must be narrowly tailored to achieve a compelling state interest.  *Parents Involved in Comm. Schs. v. Seattle School Dist. No. 1*, 551 U.S. 701, 720 (2007).

Classifications that are sometimes relevant considerations to be taken into account by legislators but generally prove no sensible ground for differentiation are subject to intermediate scrutiny.  *United States v. Virginia*, 518 U.S. 515, 531 (1996) ("*VMI*"); *Cleburne*, 473 U.S. at 440-41 ("[l]egislative classifications based on gender also call for a heightened standard of review"); *Craig v. Boren*, 429 U.S. 190, 197 (1976) ("[S]tatutory classifications that distinguish between males and females are 'subject to scrutiny under the Equal Protection Clause.'").  To withstand constitutional challenge, "classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives."  *VMI*, 518 U.S. at 531. Parties who seek to defend gender-based government action must demonstrate an exceedingly persuasive justification for that action.  *Id.* at 532 (recounting this country's "long and unfortunate history of sex discrimination").  Laws that strip individuals of their rights or restrict personal choices or opportunities solely on the basis of the individuals' gender are sex discriminatory and must be subjected to intermediate scrutiny.  *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 131 (1994) (regarding gender-based peremptory challenges, stating "we reaffirm what, by now, should be axiomatic: Intentional discrimination on the basis of gender by state actors violates the Equal Protection Clause, particularly where, as here, the discrimination serves to ratify and perpetuate

16

invidious, archaic, and overbroad stereotypes about the relative abilities of men and women."); *see also Latta* 771 F.3d at 484 (Berzon, J., concurring).

A statute or constitutional provision that mandates that women may only marry men and men may only marry women facially classifies on the basis of gender. *Latta*, 771 F.3d at 480 (Berzon, J., concurring) (noting that "[a] law that facially dictates that a man may do X while a woman may not, or vice versa, constitutes, without more, a gender classification"); *Dothard v. Rawlinson*, 433 U.S. 321, 332 (1977) (stating that a prison regulation that requires correctional officers to be the same sex as the inmates "explicitly discriminates . . . on the basis of . . . sex.").[8]

The "equal application" of these laws to men and women as a class does not remove them from intermediate scrutiny. *Latta* 771 F.3d at 484; *see also Loving*, 388 U.S. at 8 (rejecting the argument that anti-miscegenation statutes did not discriminate based on race because the statutes applied equally to African Americans and Caucasians); *Johnson v. California*, 543 U.S. 499, 506 (2005) (holding California's racially "neutral" practice of segregating inmates by race to avoid racial violence was a race classification triggering strict scrutiny notwithstanding the fact that the prison did not single out one race for differential treatment); *Dothard*, 433 U.S. at 332 (noting it made no difference whether women alone were affected or whether men were similarly

---

[8] District courts in the Eighth Circuit agree that gender-based eligibility requirements for marriage constitute sex discrimination that triggers heightened scrutiny. *Lawson*, 2014 WL 5810215 at *8 ("The State's permission to marry depends on the genders of the participants, so the restriction is a gender-based classification."); *Rosenbrahn*, No. 14-cv-4081, 2014 WL 6386903 at *10 (D. S. D. Nov. 14, 2014)(order on motion to dismiss) (stating "[b]ecause South Dakota's law, for example, prohibits a man from marrying a man but does not prohibit that man from marrying a woman, the complaint has stated a plausible claim for relief" for gender discrimination); *Jernigan*, 2014 WL 6685391 at *23-*24 (finding plaintiffs were treated differently on the basis of their gender).

limited to the same proscription).[9]  It makes "no difference to the existence of a sex-based classification whether the challenged law imposes gender homogeneity . . . or gender heterogeneity" because "[e]ither way, the classification is one that limits the affected individuals' opportunities based on their sex, as compared to the sex of the other people involved in the arrangement or transaction."  *Latta*, 771 F.3d at 484 (Berzon, J., concurring).

Gender classifications that rest on impermissible stereotypes also violate the Equal Protection Clause.  *J.E.B.*, 511 U.S. at 139 n. 11.  "[G]ender-based classifications . . . may be reflective of 'archaic and overbroad' generalizations about gender, or based on 'outdated misconceptions concerning the role of females in the home rather than in the marketplace and world of ideas.'"  *Id.* at 135 (quoting *Schlesinger v. Ballard*, 419 U.S. 498, 506–07 (1975)); *see VMI*, 518 U.S. at 533 (explaining that justifications which "rely on overbroad generalizations about the different talents, capacities, or preferences of males and females" are inadequate to survive heightened scrutiny); *Caban v. Mohammed*, 441 U.S. 380, 389 (1979) (rejecting the claim that "any universal difference between maternal and paternal relations at every phase of a child's development"

---

[9] *See also Golinski v. United States Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 982 n. 4 (N.D. Cal. 2012) (explaining that a law prohibiting a woman from marrying a woman restricts on the basis of gender because the prohibition would not apply if either were a man), *initial hearing en banc denied*, 680 F.3d 1104 (9th Cir. 2012) *and appeal dismissed*, 724 F.3d 1048 (9th Cir. 2013); *In re Levenson*, 560 F.3d 1145, 1147 (9th Cir. 2009) ("the denial of benefits at issue here was sex-based and can be understood as a violation of the . . . prohibition of sex discrimination."); *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 996 (N.D. Cal. 2010) (California's same-sex marriage prohibition restricted choices of marital partner based on gender), *aff'd sub nom. Perry v. Brown*, 671 F.3d 1052 (9th Cir. 2012), *vacated and remanded sub nom. Hollingsworth v. Perry*, 133 S. Ct. 2652 (2013); *Baehr v. Lewin*, 852 P.2d 44, 59 (Haw. 1993) (plurality opinion) (a same-sex marriage ban, "on its face, discriminates based on sex"); *Baker v. State*, 744 A.2d 864, 905 (Vt. 1999) (Johnson, J., concurring in part and dissenting in part) (a same-sex marriage bar presents "a straightforward case of sex discrimination" because it "establish[es] a classification based on sex").

justified sex-based distinctions in adoption laws); *Latta*, 771 F.3d at 486 (Berzon, J., concurring).  "Laws that rest on nothing more than the baggage of sexual stereotypes, i.e., that presume 'the father has the "primary responsibility to provide a home and its essentials," while the mother is the "center of home and family life" ' have been declared constitutionally invalid time after time."  *Latta*, 771 F.3d at 486 (quoting *Califano v. Westcott*, 443 U.S. 76, 89 (1979)); *see Stanton v. Stanton*, 421 U.S. 7, 10 (1975) (holding a gender distinction in the age of majority could not survive an equal protection challenge under any test).

In the same-sex marriage context, the Seventh Circuit's *Baskin* decision and the Ninth Circuit's *Latta* opinion are firmly rooted in a gender-based equal protection analysis.  *See Baskin*, 766 F.3d at 654 (stating "[d]iscrimination by a state or the federal government against a minority, when based on an immutable characteristic of the members of that minority, most familiarly skin color and gender, and occurring against an historical background of discrimination against the persons who have that characteristic, makes the discriminatory law or policy constitutionally suspect."); *Latta*, 771 F.3d at 469 (holding that laws that treat people differently based on sexual orientation are unconstitutional).  In *Latta*, the Ninth Circuit rejected the states' argument that children should be raised by both a male parent and a female parent as "a categorically inadequate justification for discrimination."  *Latta*, 771 F.3d at 469 (also finding it "wholly illogical" to think that same-sex marriage would affect opposite-sex couples' choices with regard to procreation.)  It further rejected the state's reliance on considerations of federalism, the argument that allowing same-sex couples to marry would be a threat to religious liberty, and the argument that the marriage ban was

justified by the state's interest in protecting "the traditional institution of marriage."  *Id.* at 474-75 (noting "[m]odern marriage regimes, however, have evolved considerably; within the past century, married women had no right to own property, enter into contracts, retain wages, make decisions about children, or pursue rape allegations against their husbands.").   In *Baskin*, the Seventh Circuit rejected the rationale that same-sex couples and their children do not need marriage because same-sex couples cannot produce children, whether intended or unintended as an argument "so full of holes that it cannot be taken seriously."  *Baskin*, 766 F.3d at 654 (noting that the states' solution to the valid and important problem of unwanted children was not tailored to the problem because denying marital rights to same-sex couples reduces the incentive of such couples to adopt unwanted children).   Both the Seventh and Ninth Circuits rejected the purported rationale that states should "go slow" in extending to same-sex couples the right to marry.   *Latta*, 771 F.3d at 474 n. 16; *Baskin*, 766 F.3d at 668-69; *see also DeBoer*, 772 F.3d at 434-35 (Daughtrey, J., dissenting)(rejecting "let the people decide" argument and stating "under our constitutional system, the courts are assigned the responsibility of determining individual rights under the Fourteenth Amendment, regardless of popular opinion or even a plebiscite.").

The Seventh Circuit found prohibitions on same-sex adoption particularly troubling.   *Baskin*, 766 F.3d at 671 (noting it was the most arbitrary feature of Wisconsin's treatment of same-sex couples).   The refusal to allow same-sex couples to adopt "harms the children, by telling them they don't have two parents, like other children, and harms the parent who is not the adoptive parent by depriving him or her of the legal status of a parent."  *Baskin*, 766 F.2d at 671; *see, e.g., Weber v. Aetna Cas. &*

*Sur. Co.*, 406 U.S. 164, 175 (1972) (invalidating workers' compensation law that disadvantaged children of unwed parents for "unjust[ly]" penalizing children); *see also Latta*, 771 F.3d at 474 ("to allow same-sex couples to adopt children and then to label their families as second-class because the adoptive parents are of the same sex is cruel as well as unconstitutional.")

An asserted preference for opposite sex parents does not, under heightened scrutiny, come close to justifying unequal treatment on the basis of sexual orientation. *Latta*, 771 F.3d at 474 (stating that denying children resources and stigmatizing their families on the basis of procreative channeling is illogical and unjust.)  *see also Bostic*, 760 F.3d at 383 (the most credible scientific researchers agree on the parenting abilities of gay men and lesbians and the positive outcomes for their children).

### 2.    *Baker/Bruning*

In *Baker v. Nelson*, 191 N.W.2d 185 (Minn. 1971), *aff'd,* 409 U.S. 810 (1972), the Minnesota Supreme Court interpreted Minnesota law to require marriage to be between couples of opposite genders.    *See id.* The Minnesota Supreme Court rejected constitutional challenges to its marriage laws and held that such an interpretation did not unconstitutionally deny the plaintiffs the fundamental right to marry, deprive the plaintiffs of liberty or property without due process, or violate the plaintiffs' Equal Protection rights.    *Id.*   On appeal, in a one-sentence order, the Supreme Court dismissed "for want of a substantial federal question."   *Baker v. Nelson*, 409 U.S. 810 (1972).

Though a summary disposition by the United States Supreme Court is a decision on the merits and has precedential value, the precedential value is not as great as a full-

fledged opinion because "a summary affirmance is an affirmance of the judgment only, [so] the rationale of the affirmance may not be gleaned solely from the opinion below." *Mandel v. Bradley*, 432 U.S. 173, 176, (1977); *see, e.g., Hicks v. Miranda*, 422 U.S. 332, 344–45 (1975). The Supreme Court affirms only the judgment, and not necessarily the reasoning employed by the lower court. *See Mandel*, 432 U.S. at 176; *Edelman v. Jordan*, 415 U.S. 651, 671 (1974) (stating "summary affirmances obviously are of precedential value . . . [but] equally obviously, they are not of the same precedential value as would be an opinion of [the Supreme Court] treating the question on the merits.").

Doctrinal developments since the *Baker* case indicate the Supreme Court's summary ruling in *Baker* is no longer reliable or binding. *See Turner*, 482 U.S. at 94-95; *Zablocki*, 434 U.S. at 382 (both discussing the right to marry); *Lawrence v. Texas*, 539 U.S. 558, 574-76 (2003); *Romer v. Evans*, 517 U.S. 620, 624 (1996) (addressing laws that draw distinctions between homosexual and heterosexual conduct or homosexuals and heterosexuals as a class). A significant majority of circuit courts have so held. *See, e.g., Latta,* 771 F.3d at 467 ("As any observer of the Supreme Court cannot help but realize, [same-sex marriage cases] present not only substantial but pressing federal questions"); *Baskin,* 766 F.3d at 660 ("*Baker* was decided in 1972—42 years ago and the dark ages so far as litigation over discrimination against homosexuals is concerned" and is "no longer authoritative."); *Bostic,* 760 F.3d at 373–75 ("[i]n light of the Supreme Court's apparent abandonment of *Baker* and the significant doctrinal developments that occurred after the Court issued its summary

22

dismissal in that case, we decline to view *Baker* as binding precedent"); *Kitchen,*
*755 F.3d at 1208* ("Although reasonable judges may disagree on the merits of
the same-sex marriage question, we think it is clear that doctrinal developments
foreclose the conclusion that the issue is, as *Baker* determined, wholly
insubstantial.")[10]   Notably, the Supreme Court did not see *Baker* as an
impediment to its consideration of DOMA in *Windsor*.   *Windsor,* 133 S. Ct. at
2691-95 (invalidating DOMA without mention of *Baker*).   The lower court decision
affirmed by the Supreme Court in *Windsor* addressed the *Baker* preclusion issue,
explaining:

> When *Baker* was decided in 1971, 'intermediate scrutiny' was not yet in the
> Court's vernacular.  Classifications based on illegitimacy and sex were not yet
> deemed quasi-suspect.  The Court had not yet ruled that 'a classification of
> [homosexuals] undertaken for its own sake' actually lacked a rational basis.  And,
> in 1971, the government could lawfully 'demean [homosexuals'] existence or
> control their destiny by making their private sexual conduct a crime.

*Windsor v. United States*, 699 F.3d 169, 179 (2d Cir. 2012), *aff'd,* 133 S. Ct. 2675
(2013).   Also, the Supreme Court has addressed federal questions involved in the
traditionally state-governed domestic relations arena when infringement of constitutional
rights is at issue.   *See, e.g., Loving,* 388 U.S. at 11; *M.L.B. v. S.L.J.,* 519 U.S. at 124
(involving right to appeal in forma pauperis a termination of parental rights); *Lassiter v.*

---

[10] District courts are in agreement.  *See, e.g., Brenner,* 999 F. Supp. 2d at 1291 ("intervening
doctrinal developments . . . have sapped *Baker's* precedential force."); *Love,* 989 F. Supp. 2d at 541–42;
*Whitewood,* 992 F. Supp. 2d at 419 (finding *Baker* no longer controlling "due to the significant doctrinal
developments in the four decades that have elapsed since it was announced by the Supreme Court.");
*Geiger v. Kitzhaber,* 994 F. Supp. 2d 1128, 1133 n. 1 (D. Or. 2014) ("[T]he Court's summary order in
*Baker* yields no lasting precedential effect in 2014."); *De Leon,* 975 F. Supp. 2d at 647 ("[S]ubsequent
doctrinal and societal developments since 1972 compel this Court to conclude that the summary
dismissal in *Baker* is no longer binding, and that the issue of same-sex marriage now presents a
substantial federal question."); *McGee v. Cole,* 993 F. Supp. 2d 639, 650 (S.D. W. Va. 2014) ("Doctrinal
developments since *Baker,* however, do justify a finding that *Baker* is nonbinding.").

*Department of Social Servs. of Durham Cty.*, 452 U.S. 18, 27 (1981) (involving right to counsel at parental rights termination hearings); and *Santosky v. Kramer*, 455 U.S. 745, 769 (1982) (holding "clear and convincing" proof standard is constitutionally required in parental termination proceedings).

The Eighth Circuit Court of Appeals addressed the constitutionality of the same amendment at issue in this case in *Citizens for Equal Prot.* v. *Bruning,* 455 F.3d at 864-70. The plaintiffs therein attacked the constitutional amendment as a violation of their right to access to the political process. *Bruning*, 455 F.3d at 865 ("Appellees do not assert a right to marriage or same-sex unions. Rather, they seek a level playing field, an equal opportunity to convince the people's elected representatives that same-sex relationships deserve legal protection."); *see* Rosenbrahn, 2014 WL 6386903, *5-*6 (finding *Bruning* holding confined to the issue of whether Nebraska's same-sex marriage ban violated a fundamental right to equal access to the political process and did not address the fundamental right to marriage). The Eighth Circuit rejected the argument that strict scrutiny should be applied to the Amendment finding that homosexuals are not a suspect classification. *Id.* at 866–67 (explaining that "[i]f sexual orientation, like race, were a 'suspect classification' for purposes of the Equal Protection Clause, then [the plaintiffs'] focus on the political burden erected by a constitutional amendment would find support" in several Supreme Court cases.). In *Bruning,* the Eighth Circuit clearly expressed its belief that laws prohibiting same-sex marriage would pass rational

basis review, but did not consider whether laws prohibiting same-sex marriage would pass intermediate scrutiny as a gender-based classification.[11]  *Id.* at 867–68.

C.      Nebraska Law

By virtue of the application of Section 29, same-sex couples are not permitted to adopt children in Nebraska.  *See* Neb. Rev. Stat. § 43-101(1); 43-120; *In re adoption of Luke*, 640 N.W.2d 374, 377 (Neb. 2002) (holding a woman could not adopt her unmarried same-sex partner's child because under the state's adoption statutes, the second parent was not a step-parent since the parties were not, and could not be, married).  Under federal law, a person's eligibility for spousal Social Security benefits is determined with reference to the law of the state where the applicant resided at the time of the application or at the time of his or her death.  42 U.S.C. § 416(h)(1)(A)(i);[12] 20 C.F.R. § 404.345,[13]  Similarly, the availability of benefits secured by the Family Medical

---

[11]  In addition, the Eighth Circuit's position on rational basis review may be considerably weakened by *Windsor*.  *See Latta*, 771 F.3d at 468 (finding "'*Windsor* established a level of scrutiny for classifications based on sexual orientation that is unquestionably higher than rational basis review'" (quoting *SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471, 474 (9th Cir. 2014))).

[12]  That statute provides

An applicant is the wife, husband, widow, or widower of a fully or currently insured individual for purposes of this subchapter if the courts of the State in which such insured individual is domiciled at the time such applicant files an application, or, if such insured individual is dead, the courts of the State in which he was domiciled at the time of death, or, if such insured individual is or was not so domiciled in any State, the courts of the District of Columbia, would find that such applicant and such insured individual were validly married at the time such applicant files such application or, if such insured individual is dead, at the time he died.

42 U.S.C. § 416(h)(1)(A)(i).

[13]  The regulation states

To decide your relationship as the insureds wife or husband, we look to the laws of the State where the insured had a permanent home when you applied for wife's or husband's benefits.  To decide your relationship as the insured's widow or widower, we look to the

Leave Act (FMLA) are determined with reference to the state of a couple's domicile.  29 C.F.R. §§ 825.102, 825.122 (b) (defining "spouse" for purposes of FMLA leave as "a husband or wife as defined or recognized under State law for purposes of marriage in the State where the employee resides, including common law marriage in States where it is recognized"). [14]   Alternative measures under state law that can arguably be taken to protect same-sex couples in committed relationships do not approximate the privileges and responsibilities that inure to persons who can be married under the law. *See, e.g.,* Neb. Rev. Stat. § 30-2606 (entitling a parent to appoint by will a guardian of an unmarried minor, subject to consideration of the minor's wishes after age 14, and subject to court supervision); Neb. Rev. Stat. § 30-2604 (providing a parent or guardian of a minor or incapacitated person by proper execution of a power of attorney may, for a period not to exceed six months, delegate to another person any of his or her powers regarding the care, custody, or property of the minor child or ward, except his or her power to consent to marriage or adoption of the minor or ward).

## III.   DISCUSSION

As a threshold matter, for the reasons stated by other courts cited *supra* at 21-25, the court finds that consideration of this issue is not foreclosed by the Supreme

---

laws of the State where the insured had a permanent home when he or she died . . . If you and the insured were validly married under state law at the time [of the application or the death], the relationship requirement will be met.

20 C.F.R. § 404.345.

[14] The Department of Labor proposes to change the definition of spouse to "the other person to whom an individual is married as defined or recognized under State law for purposes of marriage in the State in which the marriage was entered into or, in the case of a marriage entered into outside of any State, if the marriage is valid in the place where entered into and could have been entered into in at least one State."  *See* Family and Medical Leave Act - Proposed Rules, 79 Fed. Reg. 36445-01 (proposed June 27, 2014).

Court's *Baker* case or the Eighth Circuit's *Bruning* decision.  *Baker* is no longer binding precedent and *Bruning* is not controlling with respect to the issues of whether there is a fundamental liberty interest in same-sex marriage, or whether laws restricting same-sex marriage draw impermissible distinctions based on gender.

The court finds the plaintiffs have demonstrated they will likely prevail on the merits of their claim.  The court is persuaded that the Supreme Court will ultimately endorse, for one reason or another, the results obtained in the Fourth, Seventh, Ninth and Tenth Circuit challenges to same sex marriage bans.[15]  Under existing precedent, Nebraska's same-sex marriage ban is at least deserving of heightened scrutiny because the challenged amendment proceeds "along suspect lines," as either gender-based or gender-stereotype-based discrimination.  *See Baskin*, 766 F. 3d at 654-55; *Latta*, 771 F.3d at 479-90 (Berzon, J., concurring) (stating Idaho and Nevada same-sex marriage

---

[15] This conclusion is supported by the Supreme Court's recent denial of a stay of an Alabama district court decision invalidating a same-sex marriage ban.  *See Strange v. Searcy*, 2015 WL 505563 (U.S. Feb. 9, 2015) (denying of application for stay of an injunction preventing Attorney General of Alabama from enforcing Alabama laws as defining marriage as a legal union of one man and one woman) (Justice Thomas noting in dissent that the failure to stay the injunction "may well be seen as a signal of the Court's intended resolution [of the constitutional question it left open in *Windsor*]."); *see also Armstrong v. Brenner*, No. 14A650, 2014 WL 7210190 (U.S. Dec. 19, 2014) (denying stay of preliminary injunction barring enforcement of Florida's marriage exclusion); *Wilson v. Condon*, 14A533, 2014 WL 6474220 (U.S. Nov. 20, 2014) (denying stay of judgment finding South Carolina's marriage exclusion laws unconstitutional); *Moser v. Marie*, 14A503, 2014 WL 5847590 (U.S. Nov. 12, 2014) (denying stay of preliminary injunction preventing enforcement of Kansas' marriage exclusion); *Parnell v. Hamby*, No 14A413, 2014 WL 5311581 (U.S. Oct. 17, 2014) (denying stay of district court decision declaring Alaska's marriage exclusion unconstitutional); *Otter v. Latta*, No. 14A374, 2014 WL 5094190 (U.S. Oct. 10, 2014) (denying application for stay of Ninth Circuit's judgment finding Idaho's marriage exclusion laws unconstitutional)

Also, the Supreme Court itself has telegraphed its leanings.  *See Lawrence*, 539 U.S. at 605 (Scalia, J., dissenting) (stating that  "principle and logic" would require the Court, given its decision in *Lawrence*, to hold that there is a constitutional right to same-sex marriage); *see also United States v. Windsor*, 133 S. Ct. 2675, 2709 (2013) (Scalia, J., dissenting) (essentially stating that the majority opinion in *Windsor*  makes a finding of unconstitutionality regarding state same-sex marriage bans "inevitable.")

prohibitions fail as classifications based on gender as well as on sexual orientation because they do not survive the level of scrutiny applicable to such classifications).  The court finds it unnecessary, in light of this conclusion, to address the issue of whether the fundamental right to marry extends to same-sex relationships.[16]

Whether couched in terms of equal protection or due process jurisprudence, the State of Nebraska's purported rationales for its wholesale prohibition of same-sex marriage and refusal to recognize same-sex relationships valid in other states do not withstand constitutional scrutiny.  The Amendment explicitly creates a classification based on gender because a person's eligibility to marry, or to have his or her marriage recognized, is based on the gender of the individuals seeking to marry.  It facially discriminates based on gender and is subject to an intermediate level of scrutiny.   The state must show an important governmental objective and the challenged classification must be substantially related to achievement of those objectives—it must demonstrate an exceedingly persuasive justification for its gender-based action.

The State's contention that the question of whether to restrict marriage to opposite-sex couples should be left to the democratic process is unavailing.  The Amendment is not somehow insulated from review because it was enacted by a significant majority.  "Minorities trampled on by the democratic process have recourse to

---

[16] "Like all fundamental rights claims, this one turns on how we describe the right."  *Latta*, 771 F.3d at 479 (Reinhardt, J., concurring) (stating he "would also hold that the fundamental right to marriage is properly understood as including the right to marry an individual of one's choice," which would apply to same-sex marriage just as it does to opposite-sex marriage and writing separately to express his view that the same-sex marriage bans implicate substantive due process rights); *but see Baskin*, 766 F.3d at 656-57 (avoiding the fundamental right issue and confining its attention to the equal protection).  In this court's opinion, the fundamental issue in this case is equal protection.

the courts; the recourse is called constitutional law." *Baskin*, 766 F.3d at 671. Further, federalism concerns neither justify the ban nor preclude review. Though the Supreme Court in *Windsor* discussed the states' traditional authority over domestic relations matters, the Court made it clear that this authority is subject to constitutional limits. *Windsor*, 133 S. Ct. at 2691-*92* (stating "[s]tate laws defining and regulating marriage, of course, must respect the constitutional rights of persons") and noting (marriage laws "may vary, *subject to constitutional guarantees*, from one State to the next" and "[t]he States' interest in defining and regulating the marital relation, *subject to constitutional guarantees*, stems from the understanding that marriage is more than a routine classification for purposes of certain statutory benefits") (emphasis added).

The rationales presented by the State have uniformly been rejected by courts addressing the issue. *See supra* at 14-15, 19-21. The State relies essentially on variously phrased arguments that reveal a clear preference for opposite-sex parenting and express an interest in promoting biological reproduction. These arguments are rooted in archaic and overbroad stereotypes about gender roles. The State's supposed purpose in channeling children into stable relationships is not served by a same-sex marriage ban. It is both underinclusive in that it allows heterosexual people to have and rear children in unstable or abusive situations and at the same time prevents committed and stable same-sex couples from adopting and providing loving homes to children.[17]

---

[17] Addressing the argument that Indiana's same-sex marriage ban was "about successfully raising children," in the context of what has come to be known as the "irresponsible procreation" theory—that limiting marriage and its benefits to opposite-sex couples is rational, even necessary, to provide for "unintended offspring" by channeling their biological procreators into the bonds of matrimony—Judge Posner stated

Marriage is about more than procreation.  The ostensible "procreative" purpose does not hold up in light of the situations presented by infertile, intentionally childless, or elderly couples, all of whom are allowed the benefits and responsibilities of a state-sanctioned marital relationship.  Even if the State's purported justifications could be seen as important interests, a same-sex marriage ban is simply not substantially related to those interests.

The court agrees with Judge Posner's statement in *Baskin* that "these cases are about discrimination against the small homosexual minority in the United States.  But at a deeper level, as we shall see, they are about the welfare of American children." *Baskin v. Bogan*, 766 F.3d at 654 (7th Cir.) *cert. denied*, 135 S. Ct. 316 (2014).  The State essentially pays lip service to marriage as an institution conceived for the purpose of providing a stable family unit, but it ignores the damage done to children by denial of the right to marry to numerous same-sex households.

To the extent the State's position is that it has an interest in promoting family stability only for those children who are being raised by both of their biological parents, the notion that some children should receive fewer legal protections than others based on the circumstances of their birth is not only irrational—it is constitutionally repugnant.

---

Indiana's government thinks that straight couples tend to be sexually irresponsible, producing unwanted children by the carload, and so must be pressured (in the form of governmental encouragement of marriage through a combination of sticks and carrots) to marry, but that gay couples, unable as they are to produce children wanted or unwanted, are model parents—model citizens really—so have no need for marriage. Heterosexuals get drunk and pregnant, producing unwanted children; their reward is to be allowed to marry. Homosexual couples do not produce unwanted children; their reward is to be denied the right to marry. Go figure.

*Baskin*, 771 F.3d at 662.

The State's emphasis on a biological connection creates a further discriminatory classification—drawing a distinction between biological and adopted children.

In view of the overwhelming majority of decisions on the issue that align with the plaintiffs' position, the court finds it likely the plaintiffs will ultimately prevail in their challenge to the constitutionality of Section 29. Having found that the plaintiffs have shown they are likely to succeed on the merits, the court will consider the other *Dataphase* factors.

The plaintiffs have shown they will suffer irreparable harm if the State is not enjoined from enforcing the Amendment.  This harm goes beyond the inchoate injury of suffering the deprivation of a constitutional right.  The plaintiffs, especially plaintiffs Sally and Susan Waters, have shown they will suffer and are presently suffering irreparable harm for which there is no adequate remedy at law.  In view of Sally Waters's cancer diagnosis, there is a real possibility that she will not live to see this issue resolved in the courts.  The Waters family faces the concrete and certain prospect of denial of widow or survivor benefits as a result of the nonrecognition of their marriage.

Plaintiffs Nickolas Kramer and Jason Cadek have also shown a concrete and particularized injury in the denial of a parent-child relationship with respect to the child they are jointly raising.  Jason Cadek suffers the indignity and related anxiety of inability to exercise the responsibilities and privileges that parental status entails (including the ability to consent to medical treatment).  He has no legal relationship to the child who knows him as "Daddy."  The fact that the non-adoptive parent could obtain a power of attorney to consent for medical treatment is not a realistic solution to the myriad problems presented by denying a person a parental relationship.  Similarly, plaintiffs

Jessica and Kathleen Kallstrom-Schreckengost have shown their child and any potential children they might have or adopt will suffer the denial of a parent-child relationship with respect to one parent under the present system.

Plaintiffs Crystal Von Kampen and Carla Morris-Von Kampen are presently suffering financial harm in the inability of a stepdaughter to obtain veteran-connected tuition credits and have also suffered financial consequences of not being able to obtain a VA loan because their marital status is not recognized.  All of the plaintiffs have also demonstrated concrete and significant financial hardships in the form of higher taxes and taxes on health benefits.  Because numerous federal benefit programs are dependent on a states' recognition of marital status, all of the plaintiffs potentially suffer financial hardships (some, like lifetime denial of Social Security benefits, quite severe) if the ban is allowed to remain in place.

All of the plaintiffs have further demonstrated psychological harm and stigma, on themselves and on their children, as a result of the nonrecognition of their marriages. The plaintiffs have been denied the dignity and respect that comes with the rights and responsibilities of marriage.

Particularly harmful is the State's concomitant ban on adoption by same-sex couples. The State has advanced no justification, much less an exceedingly persuasive justification, for that policy.  The policy has no rational connection to the State's purported purpose of strengthening families and, in fact, it thwarts that purpose by denying deserving children a stable home.  All of the plaintiffs have demonstrated harm to their dignity and psyche in being treated as second-class citizens.  These plaintiffs

32

suffer the same harms as those identified in *Windsor*. Just as DOMA harmed the plaintiff in *Windsor*, the plaintiffs herein are harmed.

In contrast, the State has not demonstrated that it will be harmed, in any real sense, by the issuance of an injunction. The State's interest in enforcing its laws diminishes with the strong showing that the same-sex marriage ban is not a legitimate exercise of its traditional authority over domestic relations matters. All but one of the plaintiff couples are married in a state that recognizes same-sex marriage. All of the couples have been in committed relationships for many years. Those that have resided in Nebraska have not caused damage to society at large or to the institution of marriage. The court finds it is in the public's best interest to vindicate the plaintiffs' constitutional rights and enjoin the State's enforcement of its discriminatory marriage laws.

Because the standards for staying the injunction mirror the standards for issuing the injunction, the court's findings of likely success and severe irreparable harm make the court disinclined to stay the injunction. For the reasons stated herein and in the court's denial of an earlier motion for a stay, the court finds the State's oral motion for a stay should be denied.[18] However, in an effort to assuage the State's concerns with respect to administrative turmoil, the court will delay the effective date of the injunction.


IV.   CONCLUSION

---

[18] That stays have been granted in other cases in this Circuit pending appeal is of no consequence to this determination because those cases did not involve any showing of the sort of irreparable harm these plaintiffs (especially the Waters family) will suffer.

Nebraska's "Defense of Marriage" Constitutional Amendment, Section 29, is an unabashedly gender-specific infringement of the equal rights of its citizens.  The State primarily offers as its rational basis for this gender-specific discrimination the encouragement of biological family units.  The essence of this rationale has been rejected by most courts and by no less than the Supreme Court.  With the advent of modern science and modern adoption laws, same sex couples can and do responsibly raise children.  Unfortunately, this law inhibits their commendable efforts.

For the majority of married couples, those without children in the home, marriage is a legal and emotional commitment to the welfare of their partner.  The State clearly has the right to encourage couples to marry and provide support for one another. However, those laws must be enforced equally and without respect to gender.

It is time to bring this unequal provision to an end.

Accordingly:

1.      The plaintiffs' motion for a preliminary injunction (Filing No. 10) is granted;

2.      The defendant's oral motion for a stay is denied;

3.      The defendant's objection to the declaration of Angela Dunne (Filing No. 52) is overruled.

4.      A preliminary injunction, effective March 9, 2015, at 8:00 a.m. CDT will issue this date.

Dated this 2nd day of March, 2015

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge

34